IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROBERT SANDERS | § | |
| *plaintiff* | § | |
| | § | CA No. _____ |
| SOUTHWESTERN BELL, d/b/a | § | |
| AT&T | § | JURY TRIAL DEMANDED |
| *defendant* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Comes now Plaintiff Robert Sanders ("Plaintiff" hereinafter as Sanders) and files this his

Original Petition complaining of Southwestern Bell Telephone Company, d/b/a AT&T

("Defendant" hereinafter as AT&T), and for cause therefore would show the Court as follows:

### I. PARTIES

1.     Plaintiff Robert Sanders is an individual residing in Harris County, Houston, Texas.

2.     Defendant Southwestern Bell Telephone Company is a native for-profit entity, based in

Dallas, Texas at One AT&T Plaza.  This Defendant may be served with process by service upon

its legal counsel, Ms. Tomika Woods, AT&T, located at 308 South Akard Street, Dallas, Texas

75202.

### II. JURISDICTION & VENUE

3.     This Court has Jurisdiction over the claim because the Plaintiff has asserted a claim

arising under Federal Law; specifically 42. U.S.C. 1981, and 42 U.S.C. 2000e *et seq*., under

28 U.S.C. Section 1343.  Jurisdiction is also proper pursuant to Texas Labor Codes §21.051 &

§21.108 (as amended), as well as Title VII of the Civil Rights Act of 1964 (as amended), and 42

U.S.C. Section 1981. Moreover, Defendant AT&T qualifies as an "employer" under

§21.002(8)(a).

4.     Venue is proper under this District because the Plaintiff resides in this district and the events giving rise to the events forming the basis for this lawsuit occurred in this District, as well as the Residency of the Corporation in a state with multiple districts, pursuant to 28 U.S.C. §§1391 (b)(2) & (d).

### III.  FACTUAL ALLEGATIONS

5.     Mr. Robert Sanders began working for Southwestern Bell, d/b/d "AT&T", Houston, as a Premises Technician on or about January 8th, 2016, at the 5252 Hollister location.  Throughout the tenure of his employment, Mr. Sanders has been an exemplary employee of AT&T.

6.     Mr. Sanders led the field against his co-workers in all qualitative metrics outlined in his position both as an AT&T employee, as well as a Premises Technician, and this fact is not unknown to his managers or supervisors.

7.     On or about May 3rd, 2017, Mr. Sanders suffered an on-the-job injury to his back while in the course and scope of his employment with AT&T.  After going through multiple rounds of treatment and consulting with (i) his general physician, (ii) an orthopedic specialist, and (iii) a physical therapist, Mr. Sanders was cleared to return to work in mid August 2017, with restrictions.

8.     Mr. Sanders' medical condition required him to be placed on Light Duty – an accommodation he requested on multiple occasions.

9.     Because Mr. Sanders' back was injured in this manner, and because Mr. Sanders also suffers from high blood pressure induced by a stressful work environment, as determined by his general physician, Mr. Sanders required – and still requires – light duty accommodations for both his personal physical condition, as well as a precaution in the face of the side effects of his blood pressure medication.

10.     Despite multiple attempts to obtain these requisite accommodations, Mr. Sanders' requests for reasonable accommodation have fallen upon deaf ears.  Based upon information and

belief, it would seem that all requests for Light Duty, as set forth by employees of African American race at this particular location, are either summarily denied, or forced into a protracted struggle through failure of communication between the Accommodations Department, and its sister Departments within the corporate structure of AT&T Houston office.

11.     However, this disparate treatment hurdle is not placed before White or Hispanic employees such as Mr. Sanders' co-workers, Mr. George Hernandez and Mr. Charles Edwards.

12.     Upon information and belief, Mr. Hernandez (Hispanic) was similarly situated to Mr. Sanders, in that he was a premises technician who also suffered an injury to his back in the course and scope of his employment and duties for AT&T.

13.     However, unlike Mr. Sanders, Mr. Hernandez received full accommodations, and received Light Duty almost as soon as it was requested.  To our knowledge, Mr. Hernandez was placed on Light Duty, and has since been promoted to a managerial desk position.  Moreover, Mr. Edwards (Caucasian) was also similarly situated as a premises technician, also requested Light Duty, and received it without delay or issue.

14.     Mr. Sanders requested Light Duty around the time of his back injury in May of 2017. Specifically told by his manager that "light duty does not exist in [his] department", Mr. Sanders was not convinced and investigated the matter further.

15.     After due diligence, Mr. Sanders discovered that in fact Gorge Hernandez (Hispanic) and Charles Edwards (white) both received light duty upon requesting it.  Both individuals were positioned as Premises Technicians, and both individuals worked within Mr. Sanders' particular department.

16.     It is Mr. Sanders' contention, after speaking with the balance of his co-workers, that African American Premises Technicians within his department are treated differently than Premises Technicians of other races  – specifically, those that request and apply for Light Duty are either summarily denied, or are forced into a 'Catch-22' between their own Departments and

Sanders / SWBTC dba AT&T Original Complaint                                          Page 3 of  27

the Accommodations Department, and Disability Department.

17.    Mr. Sanders has had to issue a prohibitive amount of requests and applications, even going so far as to supply his doctors' notes and recommendations directly to his managers and supervisors; all to little or no effect.

These allegations highlight the fact that there is a culture of racial discrimination through selective implementation of FMLA and awarding of Disability and Accommodations where African American employees are generally not afforded the light duty and accommodations that are normally given to Hispanic and Caucasian employees.

19.    Throughout his tenure at AT&T, Mr. Sanders has also had to suffer a hostile work environment created by his immediate supervisors and managers, Mr. Jones, Mr. Willis, and Mr. Nixon.

20.    A prime example of the racially motivated, specific targeting of Mr. Sanders is outlined in a reprimand he received regarding the safety of his vehicle while in the motor pool of his dispatch location.  Upon review by his crew chief, nineteen (19) Premises Technicians had failed to lock their vehicles while at head quarters on that day.  Of those nineteen individuals, eighteen (18) of them were Caucasian or Hispanic.  Mr. Sanders was the only African American Premises Technician – and the only Premises Technician to receive a formal written warning and reprimand for the safety violation that eighteen other Premises Technicians were also guilty of committing.

21.    Mr. Sanders' concerns also stem from the in-house grievance process whereby he can formally, and procedurally complain about how he feels he is being mistreated or targeted by any particular managers or supervisors.

22.    It has come to Mr. Sanders' attention that when he files a grievance, the receiving supervisor almost immediately drops or dismisses the grievance instead of allowing an actual investigation to begin, occur, and conclude.  Records of such related meetings are consistently

kept and maintained by the local union, which heretofore has refused to give Mr. Sanders a copy of any of the minutes of such meetings, or any documents filed or associated therewith.

23.     This alleged practice of dismissal after grievance could theoretically give any manager the chance to terminate an employee prior to the  investigation of a meritorious grievance claim, or even prior to the issue being recorded on the employee's record.

24.     In 2017 alone, Mr. Sanders has submitted no fewer than twenty (20) grievances and ten (10) Human Resources complaints; all written, and all towards his managers, as well as every tier of management that handles him.  To his knowledge, these have all been dismissed, or resulted in neutralized or inconclusive investigations.

25.     The grievance process is not only biased *against* AT&T employees, but also biased *in favor* of AT&T management.  The best exemplar of this is Mr. Willis issuing three (3) negative reviews to Mr. Sanders in the same day.  All three reviews contained the same negative critique and/or cause for review, and all three reviews were issued on the same day, immediately after Mr. Willis and Mr. Sanders were engaged in a personal discussion in front of other Premises Technicians during which Mr. Sanders made Mr. Willis appear to be incompetent.

26.     This bias is further solidified when the company Managers launch their own investigations.  In theory, once Managers bring an employee into a meeting regarding potential employee misconduct, an investigation is open.  It is then possible for the Managers to open the investigation, then close the meeting with the employee, but then leave the investigation open indefinitely.  Managers can then wait for months at a time, and place the employee on disciplinary steps, suspension, or proceed to termination, at their discretion, for inconclusive or amorphous reasons, without the necessity of a final determination or recorded conclusion of the issue.  It is our understanding that such procedural loopholes have been used against Mr. Sanders, as well as other African American employees of the Defendant.

27.     On or about August 10th, 2017, Mr. Sanders' Short Term Disability ended, but his personal targeting and harassment by management continued.  Mr. Sanders was ultimately forced to constantly send text messages to his managers including pictures of his work he would take with his company-issued phone while on duty.  Ostensibly this was so his managers could (i) see that he was in fact on the job, and (ii) confirm that he was doing his job correctly.

28.     Mr. Sanders feels the internal investigations, complaint, and appeals process within AT&T is fundamentally flawed, and has failed him.  Despite the fact that he has continuously requested accommodations, as well as the fact that said accommodations were approved by his Disability Department Case Manager, a loop hole exists indicating that he also needs approval from the Accommodations Department Manager.

29.     Upon information and belief, employees are instructed that Disability and Accommodations are two separate departments.  However, both departments apparently receive the same confidential information through a shared fax line.  This creates an illusion that one department cannot, or does not, speak to the other; when, in fact, they may very well be one in the same office.

30.     The above disparate treatment request measure has had an entirely detrimental and freezing effect on Mr. Sanders' desperate attempts to find accommodations after his back injury and in the face of the side effects of blood pressure medication, and has led directly to the continuous rejection of his disability accommodations requests.

31.     Where Caucasian and Hispanic employees have successfully engaged in receiving accommodations, Mr. Sanders has been left in a cyclical loop of rejections.  Indeed, the fact that his disability & accommodations were declined directly caused Mr. Sanders damages in the amount of several thousand dollars in medical co-pays that he otherwise would not, and should not, have had to pay out of pocket.

32.     These are weighted by his time and effort placing multiple requests for the same accommodations and benefits, as well as the coordination of clinical visits he should not have had to orchestrate on his own.  The above circumstances forced Mr. Sanders to take several weeks off of work, and exhausted all of his vacation and personal days.  Only after all of Mr. Sanders' personal vacation time was exhausted, did AT&T temporarily approve his accommodations requests.

33.     Mr. Sanders has been under the distinct impression that the Second Line Manager, Mr. Marcus Rios, possessed a racial animus against him since the inception of his employment, and the very first time Mr. Sanders lodged a grievance with his employer.

34.     This animus crystalized for Mr. Sanders when Mr. Rios told him point blank that his 'accommodations would not be approved or accepted by the Accommodations Department' days prior to Mr. Sanders actually submitting his completed forms and requests.  This was confirmed when he was informed that the Accommodations Request he sent to the Disability case manager was summarily declared null and void.

35.     The first grievance Mr. Sanders filed stemmed from an incident that occurred during Mr. Sanders' initial training at AT&T, where, in front of multiple co-workers, his trainer told him "*I'll whoop your ass, N----r*."  Mr. Sanders found this comment offensive and filed a complaint which, to his knowledge, was summarily dismissed.

36.     As of that time, Mr. Rios has used multiple managers as Cats Paws to harass and berate Mr. Sanders.  These managers include Mr. Nixon, Mr. Thompson, Mr. Cooper, Mr. Jones, and Mr Willis.  As Mr. Sanders felt that there was no avenue for review of Mr. Rios' actions and admonitions towards himself – due mainly to the fact that Mr. Rios and his supervisor, Mr. Chris Freyhoff, are known to be personal friends.  In fact, Mr. Freyhoff is the very manager who awarded Light Duty to Mr. Hernandez, and saw to his promotion to a managerial position.

37.     On or about 11/3/2017, AT&T suspended Mr. Sanders for having a bluetooth earpiece in his ear, just like every other premises technician.  This suspension was a test-case issue, as it had never been raised before to any employees or for any reason.  Instead of making this a teaching or coaching moment, Mr. Sanders' managers chose to suspend Mr. Sanders' for doing what all other premises technicians do, without warning or provocation, using safety as a pretext.  Management chose to allow Mr. Sanders to spend the entire day with his bluetooth ear piece, as opposed to simply instructing him otherwise.

38.     Mr. Sanders was then erroneously placed on a separate disciplinary procedure, and has been forced to sign a letter regarding steps of improvement, or face termination.  This suspension is on the heels of multiple Human Resources complaints filed by Mr. Sanders throughout the week of October 23rd, 2017.  One could be forgiven for inferring that this suspension served as a form of punishment or retaliation for Mr. Sanders' complaints filed days prior.

39.     The above suspension did not stem from an incident which occurred at a job site, or even off AT&T premises.  This suspension occurred during a so-called "Safety Rodeo", a training event wherein managers pull two or three crews together and walk employees through existing and newly-implemented safety measures including one day of coaching and one day of training.

40.     On information and belief, all of this occurs on AT&T premises, within a parking lot or empty site.  As Mr. Sanders came onto the AT&T premises, a co-worker noticed that Mr. Sanders' bluetooth ear piece was in his ear.  While the AT&T employee handbook may not specifically prohibit AT&T premises technicians from having bluetooth ear pieces in their ears, Mr. Sanders was aware of the fact that Premises Technicians are prohibited from talking on the phone while driving, during the course and scope of his duties for AT&T.

41.     The point of contention arises with the fact that no manager questioned whether Mr. Sanders was on his phone while driving to the AT&T training premises, and totally failed to check his work or personal phone for any phone usage during that time.  Mr. Sanders  could not

ignore the fact that a major telecommunications company failed to verify such a rudimentary or simple condition; the veracity of which would either allow and enforce the above referenced suspension, or neutralize it for lack of substantiation.

42. Further, instead of instructing or coaching Mr. Sanders, during a so-called "Safety Rodeo" whereby employees are allegedly coached on safe and correct procedure and work habits, the above named managers brought Mr. Sanders into a safety investigation meeting without any warning or foreknowledge, and abused their position in order to further their animus against Mr. Sanders.

43. To be clear, these managers proceeded to punish Mr. Sanders without proof or provocation that Mr. Sanders was speaking on the phone while driving at any point in time. While employed with AT&T, Mr. Sanders had the requisite Drive App on his phone which makes it inert while he is in motion. Moreover, Mr. Sanders did not even have his personal phone in the cab of the company car while he was driving to the site.

44. The fact that AT&T management did not even bother to check if Mr. Sanders had his phone on his person, or if Mr. Sanders made or received any calls during the drive between the garages/premises, speaks volumes about their specific targeting of Mr. Sanders and displays their clear and overt animus against him, clouding even the application of simple logic.

45. Finally, despite Mr. Sanders' multiple complaints to AT&T Management, including his first and second line managers, Mr. Sanders had no choice but to retain counsel regarding his concerns with his employer[1]. In November of 2017, Mr. Sander's counsel submitted a demand letter to AT&T requesting accountability for the above referenced allegations, as well as requesting protection and guardianship against possible spoliation of evidence which may be

---

[1] In 2017 alone, Mr. Sanders had submitted no fewer than twenty (20) grievances and ten (10) Human Resources complaints; all towards his managers, as well as to every tier of management that could have helped him address his concerns. To date, and on information and belief, these have all been dismissed, or resulted in neutralized or inconclusive investigations.

required for litigation of the concerns made the basis of the letter.

46.     After submission of this demand letter to the AT&T corporate offices, Mr. Sanders began

to receive negative attention, feedback, reviews, and treatment by his managers.  This was

directly reflected in his performance evaluations, communiques, and meetings between himself

and the above referenced managers.

47.     On or about January 18th, 2018, while still employed by the Defendant, Mr. Sanders filed

his complaint with the EEOC, with attached Form 5 Addendum. [**Plaintiff's Exhibit A**].

Sometime thereafter, the Defendant supplied a rather useless Position Statement [**Plaintiff's

Exhibit B**], Mr. Sanders responded to the EEOC with his own Answer to AT&T's Position

Statement [**Plaintiff's Exhibit C**].  Mr. Sanders is compelled to submit a copy of this response to

AT&T's position statement due to the fact that the information they supplied to the EEOC is so

replete with factual errors and inconsistencies, that he was concerned they may not be referencing

the correct employee.

48.     On or about February 16th, 2018, approximately one (1) month after filing his complaints

with the Equal Employment Opportunity Commission, Mr. Sanders was approached by Mr.

Freyhoff, Mr. Rios, and Mr. Mixon.  An impromptu meeting took place within the on-site offices

in which these managers began yelling at Mr. Sanders.  On information and belief, a record of

this incident exists within the on-site cameras installed within the premises.

49.     In response, Mr. Sanders began to raise his voice against the verbal abuse and tirades.

This confrontation ended with Mr. Rios invading Mr. Sanders' personal space, and ultimately

suspending Mr. Sanders without cause or reason. This suspension continued until Mr. Sanders

was notified of his termination.

50.     On or about March 12th, 2018, approximately two (2) months after his filing of a

complaint with the Equal Employment Opportunity Commission, Mr. Sanders was terminated

from employment with AT&T.  Mr. Sanders filed an amended Charge on or about August 19th, 2019, reflecting that termination.  The EEOC then issued Mr. Sanders his statutory notice of right to sue on or about August 22nd, 2019.

51.      To this end, Mr. Sanders hereby brings the following claims and arguments based on the above referenced allegations.

### IV.   CAUSES OF ACTION

**RACIAL <u>DISCRIMINATION</u> UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 under 42 U.S.C. §2000e-2 *et seq*., as well as 42 U.S.C. 1981; *and in the alternative*, §21.002 *et seq* of the TEXAS LABOR CODE the Texas Commission on Human Rights Act of the Texas Labor Code (the "Act")**

### A.      TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. §2000e *et seq*.

52.      Plaintiff hereby adopts all factual allegations above *in haec verba*.

53.      A claim of intentional discrimination may be proved by either direct or circumstantial evidence. See *Wallace v. Methodist Hosp. Sys*. 271 F.3d 212, 219 (5th Cir. 2001).  In cases of circumstantial evidence, courts usually follow the burden shifting analysis articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), for indirect discrimination claims. See *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007); *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 405 (5th Cir. 2005).

54.      To establish a *prima facie* case of discrimination, a plaintiff must establish he: (1) is a member of a protected class; (2) was qualified for the position at issue; (3) was subjected to an adverse employment action; and (4) was replaced by someone outside the protected class, or other similarly situated persons were treated more favorably.  *McCoy*, 492 F.3d at 556; *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512-13 (5th Cir. 2001).

55.      In the instant case, Plaintiff is prepared to show that he (1) is a member of the class (African American) who is intended to be protected by the statute; (2) was qualified for the position at issue, an irrefutable fact as he was vetted and hired by the Defendant; (3) was subject

to adverse employment action, in the form of near-constant harassment by his managers at every

level, the creation of a hostile work environment, and his ultimate termination; and (4) other

similarly situated persons (all Non-African-American Premises Technicians) were treated more

favorably. *Id*.

*56.*     Plaintiff would further establish his *prima facie* case of discrimination by noting that a

multitude of Caucasian and/or Hispanic employees in the same or similar position were not

terminated as the Plaintiff had been terminated.

### B.     RACIAL DISCRIMINATION UNDER  42 U.S.C. § 1981

57.     Plaintiff hereby adopts all factual allegations above *in haec verba*.

58.     **§1981 STATUTE OF LIMITATIONS**.  Pursuant to 28 U.S. Code §1658(a); Except as

otherwise provided by law, a civil action arising under an Act of Congress enacted after the date

of the enactment of this section may not be commenced later than 4 years after the cause of

action accrues.

59.     Section 1981 prohibits race discrimination & retaliation [2], which includes African

Americans within that ambit.  For purposes of Section 1981, African American is a "race".  *See*

*Jatoi v. Hurst-Euless Bedford Hosp. Authority*, 807 F.2d 1214, 1218 (5th Cir. 1987); *Banker v.*

*Time Chem., Inc.*, 579 F. Supp. 1183, 1186 (N.D. Ill. 1983).

60.     In the absence of direct evidence of discrimination, Section 1981 cases are governed by

the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792,

802–04 (1973). *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007); *Shackelford v.*

*Deloitte & Touche, LLP*, 190 F.3d 398, 403 n.2 (5th Cir. 1999) (noting that Section 1981 claims

and Title VII claims use the same burdens of proof and analysis).

---

[2] On May 27th, 2008, The Supreme Court delivered its decision in *CBOCS West, Inc*. v. *Humphries* holding
that Section 1981 of the Civil Rights Act of 1866 unequivocally includes claims of **retaliation** by those pursuing
race and color claims under the statute.

61.     First, the plaintiff must establish a *prima facie* case of discrimination, "which requires a showing that the plaintiff (1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group."  *McCoy*, 492 F.3d at 556; *Caldwell v. Univ. of Houston Sys.*, 520 Fed. Appx. 289, 293 (5th Cir. 2013); *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 425 (5th Cir. 2000).

62.     If the plaintiff makes a *prima facie* showing of discrimination, the employer must then provide a legitimate, non-discriminatory reason for the employment action. *Byers*, 209 F.3d at 425. "The burden on the employer at this stage is one of production, not persuasion; it can involve no credibility assessment." *Alvarado v. Tex. Rangers*, 492 F.3d 605, 611 (5th Cir. 2007) (quotations and citations omitted).

63.     If the employer provides a legitimate, non-discriminatory reason, "the burden shifts back to the plaintiff to establish either: (1) that the employer's proffered reason is not true but is instead a pretext for discrimination; or (2) that the employer's reason, while true, is not the only reason for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic." *Id*. (citation omitted). "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 249 (1981)).

64.     The Plaintiff hereby sets forth the argument that any such proffered reasons for termination issued forth by the Defendant, especially those leveled against the Plaintiff at any point in time after (i) the submission of a demand letter by his attorney of record in November of

2017; or (ii) the submission of an official complaint to the EEOC in January of 2018, create the

assumption that such reasons are mere pretext – or while partially true, are not the only

motivating factors of the adverse employment actions taken against the Plaintiff.

### C. RACIAL DISCRIMINATION under CHAPTER 21 OF THE TEXAS LABOR CODE under the Texas Commission on Human Rights Act §21.002 *et seq* of the Texas Labor Code (the "Act")

65.    Plaintiff hereby adopts all factual allegations above *in haec verba*.

66.    Plaintiff brings suit against Defendant for damages sustained as a result of their

discrimination in wilful violation of the Texas Commission on Human Rights Act **§**21.000 *et seq*

of the Texas Labor Code (the "Act").

67.    Under §21.051 of the Texas Commission on Human Rights Act (codified within §21.000

*et seq* of the Texas Labor Code): An employer commits an unlawful employment practice if

because of ...*race*, the employer: (1)... discharges an individual, or discriminates in any other

manner against an individual in connection with compensation or the terms, conditions, or

privileges of employment;  or (2)  limits, segregates, or classifies an employee ... in a manner that

would deprive or tend to deprive an individual of any employment opportunity or adversely

affect in any other manner the status of an employee. *Id.*

68.    Pursuant *Ysleta ISDA v. Monarrez*, 177 S.W.3d 915, 917 (Tex. 2005). "To prevail on a

claim of racial discrimination, the plaintiffs had to prove that (1) they were members of a class

protected by the act, (2) they were qualified for their positions, (3) they were terminated, and (4)

they were treated less favorably than similarly situated members of the opposing class. *Id.*

69.    In this case, Plaintiff (1) as an African American, belongs to a protected class, (2) was

qualified for his position, (3) was terminated from his position, and (4) the plaintiff was treated

less favorably than similarly situated Non-African-American employees. *Id.* Moreover, Plaintiff

would show that the hostile work environment and negative treatment was severe, pervasive, and

that it destroyed his opportunity to succeed in the workplace, despite his multitude of formal and informal complaints to Human Resources / Local Union.

70.     Under §21.125 of the Texas Commission on Human Rights Act (codified within §21.000 *et seq* of the Texas Labor Code): Except as otherwise provided by this chapter, an unlawful employment practice is established when the complainant demonstrates that race, color, sex, national origin, religion, age, or disability was a mere *motivating factor* for an employment practice, even if other factors also motivated the practice, unless race, color, sex, national origin, religion, age, or disability is combined with objective job-related factors to attain diversity in the employer's work force. *(Emphasis added) Id*.

71.     Plaintiff argues that his racial background was the reason he was subjected to adverse employment actions, including his ultimate termination, and would also contend that race was a motivating factor - in part or in whole - regarding such adverse employment actions, as well as his eventual termination.  Plaintiff is prepared to show that any objective job-related factor exists which would foster the requirement of her termination from AT&T is mere pretext, and would argue that no legitimate non-discriminatory reasons exists that would challenge his assertions, or which could rebut or refute his claims at summary judgment.

72.     Plaintiff alleges and will prove that Defendants illegally discriminated against her based upon her gender under the Texas Commission on Human Rights Act: **§**21.000 *et seq* of the Texas Labor Code.


**RETALIATION UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 under 42 U.S.C. §2000e *et seq*., as well as 42 U.S.C. § 1981; *and in the alternative,* §21.002 *et seq* of the TEXAS LABOR CODE the Texas Commission on Human Rights Act of the Texas Labor Code (the "Act")**

73.     Plaintiff hereby adopts all factual allegations above *in haec verba*.

74.     Specifically, Plaintiff would reference the facts regarding the temporal proximity of the

sequential submission of his complaint to the Equal Employment Opportunity Commission, and

his subsequent termination within the following weeks.[3]

### A.   TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 under 42 U.S.C. §2000e *et seq*, *and* 42 U.S.C. § 1981 [4]

75.   Plaintiff hereby adopts all factual allegations above *in haec verba*.

76.   Plaintiff further asserts that retaliation analysis under Title VII and Section 1981 are

nearly identical, and that a secondary argument would be redundant, hence the following

argument shall espouse both claims under Section 1981 and Title VII.

77.   To successfully bring a claim of <u>retaliation</u>, the complainant must generally  establish

that 1) he or she engaged in activity protected by the statute; 2) that the employer took

an adverse employment action against him or her; and 3) a causal connection exists between the

protected activity and the adverse employment action.   *Gee* v. *Principi*, 289 F.3d 342, 345

(5th Cir. 2002)(Title VII); *Davis* v. *Dallas Area Rapid Transit*, 383 F.3d 309 (5thCir.

2004)(retaliation under 42 U.S.C. §1981); *Hernandez* v. *Crawford Building  Material*

*Co.*, 321 F.3d 528 (5th Cir. 2003)(ADEA); 42 U.S.C. §12203(a), (b) (Americans with

Disabilities Act).

78.   **ENGAGEMENT**.   The Fifth Circuit defines protected activity as  "opposition  to

any  practice  rendered unlawful by Title VII, including  making  a  charge, testifying,

assisting   or   participating   in   any investigation, proceeding or hearing under Title

---

[3] The amount of **time** between an employee's protected activity and the adverse employment action is "part of the analysis" with respect to whether an employee can establish the necessary causal connection. *Gee*, 289 F.3d 346 n.3 (quoting *Shirley* v. *Chrysler First, Inc*., 970 F.2d 39, 44 (5th Cir. 1992)).  Timing can be a relevant factor in determining whether a causal connection exists where the timing is "suspiciously proximate." *Fabela*, 329 F.3d 417 n.9.

[4] As of May 27th, 2008, the United States Supreme Court delivered its decision in *CBOS West, Inc.* v. *Humphries*, NO 06-1431 (May 27, 2008)(slip op.)., holding that Section 1981 of the Civil Rights Act of 1866 unequivocally includes claims for retaliation by those pursuing race and color claims under the Statute.

VII." *Ackel* v. *Nat'l Communs., Inc.*, 339 F.2d 376, 385 (5thCir. 2003).   More simply, "Title VII prohibits an employer from retaliating against an employee because that   employee has   complained   about   acts   of discrimination   at work."   *Manning* v. *Chevron Chem. Co.,LLC*,   332   F.3d   874   (5th   Cir.   2003).   To that end, the Plaintiff did make a charge with the EEOC prior to his termination from employment, and prior to that, did engage in the internal administrative complaint processes of the Defendant.

79.   An employee's use of an employer's internal administrative  process  to  file  an employment discrimination complaint is "clearly protected activity" for  purposes  of  a retaliation  claim.   *Fierros*  v.  *Tex. Dep't of Health*, 274 F.3d 187, 194 (5th Cir. 2001).  A plaintiff is  not  required  to  establish  an  actual violation  of  Title  VII  to  invoke  the protections  of  the anti-retaliation  provisions. Rather,  a  plaintiff  only needs   show   that   a charge  was  made,  or  that participation  in  investigation  of  a  claim  occurred. *Green* v. *Administrators of Tulane  Educational  Fund*, 284  F.3d 642, 657 (5th Cir. 2002).   A plaintiff's reasonable  belief  that she  was  in  the  process  of being terminated  because  of her  gender  and  made  a complaint is sufficient for a retaliation claim.  *Id.*

80.   To that end, Plaintiff would site his multitude of complaints, both submitted in writing, and verbal interactions with several AT&T Managers, including a representative of the Local Union at almost every meeting, to display his qualification in engaging within the employer's internal administrative process, actively and continuously up to the date of his termination.

81.   **ADVERSE ACTION**. Although the  Fifth  Circuit  generally  applies  Title  VII holdings to claims brought under §1981, the definition of  adverse  employment  decision  is broader  under §1981.   Under  §1981,  reprimands,  disciplinary  filings  and  transfers  that  are "equivalent  to  demotions"  may  be  considered  adverse  employment  actions.   *Banks*, 320 F.3d at 580; *Erves*, 2004 WL 904122 at *

82.     In the Title VII context, the Fifth Circuit applies a much more restrictive definition of adverse employment action. In *Mattern* v. *Eastman Kodak Company*, 104 F.3d 702, 707 (5th Cir. 1997), the court determined that Title VII was "designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions."

83.     Thus, only those acts such as "hiring, granting leave, discharging, promoting and compensating" constitute adverse employment actions for purposes of a retaliation claim. *Id.* Only the Fifth Circuit and the Eighth Circuit apply the "ultimate employment decision" standard.   Compare *Matternand Ledergerber* v. *Stangler*, 122 F.3d 1142 (8th Cir. 1997), with *Von Gunten* v. *Maryland*, 243 F.3d 858 (4thCir. 2001); *Wideman* v. *Wal-Mart Stores*, 141 F.3d 1453 (11th Cir. 1998); *Knox* v. *Indiana*, 93 F.3d 1327 (7th Cir. 1996); *Berry* v. *Stevinson Chevrolet*, 74 F.3d 980 (10th Cir. 1996); *Wyatt* v. *City of Boston*, 35 F.3d 13 (1st Cir. 1994); *Yartzoff* v. *Thomas*, 809 F.2d 1371 (9th Cir. 1987).

84.     **CAUSAL CONNECTION**.  The final element of a plaintiff's prima facie case requires a plaintiff to establish a causal connection between his or her protected activity and the adverse employment action suffered.   This causal link "need not rise to the level of a 'but for' standard.'" *Gee*, 289 F.3d at 345 (quoting *Raggs* v. *Miss. Power & Light Co.*, 278 F.3d 463, 471 (5th Cir. 2002)).   Nor does a plaintiff need to prove that "her protected activity was the sole factor motivating the employer's challenged decision in order to establish the 'causal link' element of a *prima facie* case." *Id.* (quoting Long v. *Eastfield Coll.*, 88 F.3d 300, 305 n.4 (5th Cir. 1996)).   In fact, the causal link element is "much less stringent" than the "but for" causation standard to be presented to a jury for determination. *Banks-Jones* v. *Hilton Reservations Worldwide, LLC*, 2004 WL 190266 (N.D. Tex. 2004)(quoting *Montemayor* v. *City of San Antonio*, 276 F.3d 687, 692 (5th Cir. 2001)).

85.     In the more usual case of circumstantial evidence, the burden of production, not proof, shifts to the employer upon plaintiff's establishment of his or her prima facie case. See gen. *Davis*, 383 F.3d at 320. The employer's burden of production in this context is relatively low,7 and very few cases are decided on the basis of an employer's inability to merely articulate a non-discriminatory reason for the employment decision at issue. Instead, the cases overwhelmingly deal with whether the plaintiff has demonstrated that the employer's articulated reason is a pretext for retaliatory motive. See *Aldrup* v. *Caldera*, 274 F.3d 282, 286 (5thCir. 1996). To this end, the Plaintiff would require the myriad of notes taken by the Union representative during meetings regarding his complaints and warnings between himself and his former employer both prior-to, and immediately-following, his Letter of Demand / Submission of EEOC complaint, and just prior to his termination, and begs that the Court see fit to assist him in obtaining same.

### A(i)  Retaliation under 42 U.S.C. §2000e-3(a) *et seq,* §704, of Title VII of the Civil Rights Act of 1964 (as amended)
- Discrimination and/or Retaliation for making charges, testifying, assisting, or participating in enforcement proceeding-

86.     Plaintiff hereby adopts all factual allegations above *in haec verba*.

87.     A plaintiff may proceed with a Title VII Retaliation claim even after the underlying discrimination claim has been dismissed. *E.g. Steffy v. Ford Motor Co. Inc*., 04-cv-319s, 2007 U.S. Dist. Lexis 20524, at *35 (W.D.N.Y. March 22, 2007)(discrimination and harassment claim dismissed but plaintiff allowed to proceed with retaliation claim); *Rivas v. Steward Ventures Inc. d/b/a Alamo Rental Car*, No. CV-05-3801, 2007 U.S. Dist. Lexis 10232, at *17 (D. Ariz., Feb. 13, 2007)(granting summary judgment on plaintiff's sexual harassment claim but permitting retaliation claim to proceed).

88.     Absent direct evidence of discrimination, the analytical framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Department of Community Affairs v.*

*Burdine*, 450 U.S. 248 (1981) is used to decide Title VII Retaliation cases based on circumstantial evidence.[5] This analytical model has generally been adopted for retaliation claims regardless of the court or the statutory basis for the protected activity.

89.    A plaintiff pursuing a Title VII Retaliation claim must initially establish a *prima facie* case. To do so, the plaintiff must show: (i) he or she engaged in protected activity; (ii) the employer carried out an adverse employment action; and (iii) a casual connection between the protected activity and the adverse action. *Stewart*, 586 F.3d 321, 331 (5th Cir. 2009).

90.    In the Fifth Circuit, the mixed motive or "motivating factor" standard is also available in circumstantial evidence retaliation cases. Accordingly a plaintiff can recover if she can show that protected activity was a "motivating factor" in the employment decision, even if other factors also motivated the practice. See, *e.g. Richardson v. Monitronics Intern., Inc.*, 434 F.3d 327, 333 (5th Cir. 2005); see *Smith v. Xerox Corp.*, 602 F.3d 320, 333 (5th Cir. 2010) (holding mixed-motive standard applies to Title VII retaliation claims even where plaintiff has no direct evidence of retaliation).

91.    An employee may show that he or she has engaged in protected activity by demonstrating either that she participated in an activity protected by the employment statute, or that she opposed an unlawful employment practice prohibited by the employment statute. See *Crawford v. Metro Gov't Nashville & Davidson County*, 555 U.S. at 277-78 (2009).

92.    An employer may not retaliate against an employee for engaging in a protected activity. Pursuant to 42 U.S.C. 2000e-3(a) protected activities include, but are not limited to, (i) the filing of a lawsuit, (ii) a request for maternity leave, (iii) hiring an attorney, or (iv) an *informal oral complaint*. *Id*.(emphasis added).

---

[5]Title VII, which prohibits employers from discriminating against employees and applicants based on an individuals' race, color, religion, sex or national origin, *also* prohibits an employer from retaliating against an employee who has engaged in activity protected by the Act. 42 U.S.C 2000e-3(a).

93.     Plaintiff would show that he has met the required elements under *Stewart*. (i) Plaintiff engaged in protected activity in the form of such oral and written complaints; (ii) his employer carried out multiple adverse employment action(s) against him, including his termination; and (iii) a causal connection between the protected activity and the adverse action exists in fact and in temporal proximity.  *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 331 (5th Cir. 2009).

94.     Plaintiff would further argue that the causal nexus is bolstered by the extreme proximity in time between his written and oral complaints, his demand letter submitted by his counsel of record, his filing of an official complaint with the EEOC, and his untimely, retaliatory termination.

95.     Plaintiff is aware that pursuant to the holding in *Nassar*, Title VII Retaliation cases still require a "but-for" causation to substantiate the claim of retaliation. *University of Texas Southwestern Medical Center v. Nassar*, 2013 U.S. LEXIS 4704 (June 24, 2013).  With this in mind, Plaintiff contends that 'but-for' his multitude of oral and written complaints, constituting protected activity, to the Human Resources Director, Local Union, and the EEOC regarding the behavior of the Defendant's Managers and Officers, as well as the negative treatment he received due to the submission of those complaints, he would not have been terminated.

### B.     RETALIATION pursuant to CHAPTER 21 OF THE TEXAS LABOR CODE under the Texas Commission on Human Rights Act §21.002 *et seq* of the Texas Labor Code (the "Act")

96.     Plaintiff hereby adopts all factual allegations above *in haec verba*.

97.     **Pursuant to Section 21.055.  RETALIATION.**  An employer, labor union, or employment agency commits an unlawful employment practice if the employer, labor union, or employment agency retaliates or discriminates against a person who, under this chapter:

(1)  opposes a discriminatory practice; (2)  makes or files a charge; (3)  files a complaint;  or (4) testifies, assists, or participates in any manner in an investigation, proceeding, or hearing.

98.     Like  federal  employment  statutes,  the  TCHRA  prohibits  an  employer  from  retaliating against a person who 1) opposes a discriminatory practice; 2) makes or files  a  charge;  3)  files a  complaint;  or  4)  testifies, assists, or   participates   in   any   manner   in   an investigation,  proceeding  or  hearing.   Tex. Lab. Code §21.055.   Because  the  purpose  of the  TCHRA  is  to provide for the execution of the policies of Title VII of the   Civil   Rights Act  of  1964,  "analogous   federal  statutes  and  the  cases  interpreting  them"  are  guiding authority.   Tex. Lab. Code  §21.001(1)  (Vernon  1996); *Quantum Chem. Corp* v. *Toennies*, 47 S.W.3d 473, 476 (Tex. 2001).

99.     Texas  courts  have  articulated  the  same  elements  as  federal  courts  for  establishing  a prima facie  case  of  retaliation  under  the  TCHRA.   See *Wal-Mart  Stores*, *Inc*.  v.  *Lane*,  31 S.W.3d  282,  295  (Tex.App. –  Corpus Christi  2000),  rehrg.  overruled).    As  with federal  statutes,  a  plaintiff  under  the  TCHRA  must  prove  that he or she engaged in some conducted protected by the Act.

100.    For the above reasons, Plaintiff hereby re-incorporates all above arguments issued for his federal claims, and would apply same to his state claims as alleged herein.

## V.    INFERENCE OF PRETEXT

101.    Where, as here, the plaintiff makes out a *prima facie* case of discrimination, the defendant must articulate a legitimate non-discriminatory reason for the adverse employment decision.  *See Baker*, 430 F.3d at 754-55.  After the employer does so, "any presumption of [discrimination] drops from the case" and the burden shifts back to the employee to establish that the employer's "stated reason is actually a pretext for [discrimination]."  *Baker*, 430 F.3d at 755 (quoting *Septimus*, 399 F.3d at 610-11).

102.    Plaintiff would show that terminating him for allegedly inappropriate speech or conduct – in light of the multitude of complaints filed by the Plaintiff himself with the Defendant's Human Resources Department, as well as his official submission of a complaint to the Equal

Employment Opportunity Commission prior to his termination – establishes the so-called 'legitimate non-discriminatory reason' for termination as mere pretext.

103.     This is further crystalized by the fact that the Plaintiff's verbal warnings and disciplinary write ups immediately escalated after the submission of his Equal Employment Opportunity Commission complaint and attorney's demand letter.  Moreover, the Defendant has supplied an abundance of factually inaccurate and incomplete information to the EEOC in their responding position statement, the measure of which would provide ample resource for pretext in nearly all charges and causes of action alleged by the Plaintiff.  By and through this argument, Plaintiff's claims would survive summary judgment.[6]

## VI.   DAMAGES

104.     A claim of intentional discrimination may be proved by either direct or circumstantial evidence. See *Wallace* v. *Methodist Hosp. Sys.* 271 F.3d 212, 219 (5th Cir. 2001). See also *McCoy*, 492 F.3d at 556; *Okoye* v. *Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512-513 (5th Cir. 2001).  In cases of *circumstantial* evidence, courts usually follow the burden shifting analysis articulated in *McDonnell Douglas Corp.* v *Green*, 411 U.S. 792, 802 (1973)(emphasis added), for indirect discrimination claims. See *McCoy* v. *City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007); *Wheeler* v. *BL Dev. Corp.*, 415 F.3d 399, 405 (5th Cir. 2005).

105.     Indeed, most federal courts disregard a requirement for direct evidence when indirect or circumstantial evidence is available. See *Desert Palace, Inc.* v. *Costa*, 539 U.S. 90 (2003)(rejecting direct evidence rule); *Sanderson* v. *Reeves Plumbing Co.*, 530 U.S. 133 (2000)(rejecting rule requiring direct evidence).

---

[6] *See, e.g., Haire v. Board of Sup'rs of La. State Univ. Agricultural & Mech. Coll.*, 719 F.3d 356, 365 n. 10 (5th Cir. 2013) (reversing summary judgment for the employer in a discrimination case, and holding that, "[e]vidence demonstrating that the employer's explanation is false or unworthy of credence . . . is likely to support an inference of discrimination *even without further evidence of defendant's true motive*.") (italics in original)

106.     Given Mr. Sanders' record of performance and evaluation of his metrics in the course and scope of his work, it is also his contention that any proffered legitimate nondiscriminatory reasons AT&T and Mr. Freyhof or Mr. Rios would set forth in efforts to legitimize their treatment of him, or the termination proceedings which followed his formal complaints to the EEOC, would fundamentally be pretextual in nature.

107.     The damages under Section 1981 and Title VII consist of back-pay, front-pay (or reinstatement), compensatory damages, punitive damages, attorney's fees, and costs.  Each component is explained below.

108.     **BACK PAY**.  Prevailing claimants under the anti-discrimination laws may recover lost back-pay and benefits.  *See Miller v. Raytheon Co.*, 716 F.3d 138, 146 (5th Cir. 2013).  The purpose of back pay is to "make whole the injured party by placing that individual in the position he or she would have been in but for the discrimination."  *Sellers v. Delgado Cmty. Coll.*, 839 F.2d 1132, 1136 (5th Cir. 1988).

109.     **FRONT PAY**.  "Front pay refers to future lost earnings."  *Wal-Mart Stores v. Davis*, 979 S.W.2d 30, 45 (Tex. App.–Austin 1998, pet. denied).  Regarding the calculation of front-pay, the Fifth Circuit has stated that  "[f]ront pay is . . . calculated from the date of judgment to age 70, or the normal retirement age, and should reflect earnings in mitigation of damages."  *Patterson*, 90 F.3d at 936 n. 8 (citing J. Hardin Marion, Legal and Equitable Remedies Under the Age Discrimination in Employment Act, 45 MD.L.REV. 298, 330–334 (1986)).  *See also Blum v. Witco Chem. Corp.*, 829 F.2d 367, 374 (3d Cir. 1987) ("In calculating a front pay award, the jury must consider the expected future damages caused by defendant's wrongful conduct from the date of judgment to retirement.").

110.     **COMPENSATORY DAMAGES**.  Mr. Sanders has suffered future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other

nonpecuniary losses, for which he seeks recovery in this lawsuit under Section 1981 and Title VII.  *See, e.g.*, *Salinas v. O'Neill*, 286 F.3d 827, 833 (5th Cir. 2002) (affirming $150,000.00 compensatory damages award under Section 1981 where the plaintiff did not receive a position because of his race); 42 U.S.C. § 1981A(a)(1) (providing for compensatory damages for such harms under Title VII).

111.    **PUNITIVE DAMAGES**.  AT&T acted with malice and reckless indifference to Mr. Sander's federally protected civil rights, thus justifying awards of punitive damages under Section 1981 and Title VII.  *See, e.g.*, *Abner v. Kansas City Southern Railroad Co.*, 513 F.3d 154, 164 (5th Cir. 2008) (affirming $125,000.00 punitive damages awards to each plaintiff under Section 1981, even though each plaintiff was awarded only $1.00 in actual damages, and strongly suggesting that any punitive damages award up to $300,000.00 per plaintiff would have been appropriate even in the absence of any actual damages); *Hampton v. Dillard Dept. Stores*, 18 F. Supp. 2d 1256 (D. Kan. 1998) (awarding the plaintiff $1,100,000 in punitive damages in a Section 1981 race discrimination case); 42 U.S.C. § 1981A(a)(1) (providing for punitive damages under Title VII when the discrimination is shown to be with "malice or reckless indifference"). In *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 119 S. Ct. 2118 (1999) the U.S. Supreme Court, interpreting Title VII, held that to satisfy the "malice or reckless indifference" requirement, the plaintiff does not have to prove that the violation was egregious or outrageous. *Id*. at 535-36.

112.    Rather, all that is requires is proof that the employer knew that is was acting in the face of a perceived risk that its actions were in violations of the law's prohibition against discrimination. *Id*.; *see also Schexnayder v. Bonfiglio*, 167 Fed. Appx. 364, 368 (5th Cir. 2006) ("a jury may award punitive damages pursuant to Title VII merely if the employer knew it *may have been* violating the law.") (italics in original).

113.    **ATTORNEY'S FEES**.  Attorneys fees are recoverable to a prevailing plaintiff under

Section 1981 and Title VII.  *See Miller*, 716 F.3d at 149 (affirming an award of attorneys' fees of

$488,437.08 to the plaintiff in a single-plaintiff discrimination case that arose in Dallas);

*Lewallen v. City of Beaumont,* 394 Fed. Appx. 38, 46 (5th Cir. 2010) (affirming an award of

attorneys' fees of $428,421.75 to the plaintiff in a single-plaintiff discrimination failure to

promote case); *Watkins v. Input/Output, Inc.*, 531 F. Supp. 2d 777, 789 (S.D. Tex. 2007)

(awarding prevailing plaintiff in a single-plaintiff discrimination case tried in Houston

$336,010.50 in attorneys' fees).

114.    Due to the unlawful discrimination and retaliation engaged in by AT&T, Mr. Sanders has

experienced concrete economic harm in economic damages, as well as emotional distress.

## VII.   EXHAUSTION OF MR. SANDERS' TITLE VII CLAIMS

115.    Mr. Sanders' claims for race discrimination are based on 42 U.S.C. 1981.  Section 1981

claims have no exhaustion requirement.  *See Williams v. E.I. du Pont de Nemours*, 154 F. Supp.

3d 407, 420 (M.D. La. 2015).  Mr. Sanders' Section 1981 race discrimination claims are subject

to a four-year statute of limitations. *See, e.g., White v. BFI Waste Servs., LLC*, 375 F.3d 288, 292

(4th Cir. 2004) ("[C]laims of discrimination in compensation [under § 1981] arise under the

1991 amendments" and thus, are subject to the four-year statute of limitations.).

116.    Mr. Sanders' claims for racial discrimination and retaliation are based on Title VII.

Exhaustion occurs when the plaintiff files a timely charge with the EEOC and receives a

statutory notice of right to sue.  *See Dao v. Auchan Hypermarket*, 96 F.3d 787, 788-89 (5th Cir.

1996).

117.    Regarding the first requirement, Mr. Sanders files his EEOC Charge on or about January

5th, 2018.  Which means that any adverse action occurring within 300 days before that date (i.e.

March 13th, 2017) is actionable under Title VII.   Regarding the second requirement, Mr. Sanders

received a statutory notice of right to sue from the EEOC that was sent to him on or about August 22nd, 2019, and he is timely filing suit after having received the letter.  Accordingly, Mr. Sanders has exhausted his administrative remedies under TITLE VII.

## VIII.  JURY DEMAND

118.    Mr. Sanders demands a trial by jury.

## IX. PRAYER

119.    Mr. Sanders asks that he be awarded a judgment against AT&T for the following:

a.      Actual damages including but not limited to pecuniary losses, non-pecuniary losses, Back-Pay, Front Pay, Compensatory Damages, and, Punitive Damages; in the sum of $450,000.00; and,

b.      Prejudgment and post-judgment interest;

c.      Attorney's fees and court costs; and,

d.      All other relief to which Plaintiff is entitled.

Respectfully Submitted,

    /s/Julian Frachtman
H. Julian Frachtman
SDTX No. 2695031
SBN:24087536
tel: 832.499.0611
fax: 713.651.0819
Hfrachtmanlaw@gmail.com
3100 Richmond, Ste 203
Houston, Texas 77098

ATTORNEY FOR PLAINTIFF